## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| STEPHEN PIRELLO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SOLARIS ENERGY INFRASTRUCTURE, INC., WILLIAM A. ZARTLER, and KYLE S. RAMACHANDRAN, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Stephen Pirello ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Solaris Energy Infrastructure, Inc. ("Solaris" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Solaris; and (c) review of other publicly available information concerning Solaris.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Solaris securities between July 9, 2024 and March 17, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Solaris provides equipment used in the completion of oil and natural gas wells in the United States. On July 9, 2024, Solaris announced that it has entered into an agreement to acquire Mobile Energy Rentals LLC ("MER"). Solaris described MER as a "premier provider of distributed power solutions serving the energy and commercial & industrial end-markets," primarily engaged in the leasing of "natural-gas powered mobile turbines." Solaris completed the MER acquisition on September 11, 2024, in exchange for approximately $60 million in cash consideration, approximately 16.5 million in shares, and repayment of approximately $71 million in MER's debt (the "Acquisition"). Following the Acquisition, the Company rebranded MER as its "Power Solutions" segment.

3.      On March 17, 2025, at approximately noon EST, Morpheus Research published an investigative report alleging, among other things, that MER had been "a ~$2.5 million revenue equipment leasing business based out of a condo **with zero employees, no turbines, and no track record in the mobile turbine rental industry.**" The report revealed that one of MER's co-owners, John Tuma ("Tuma") was in fact, a "convicted felon" for "environmental crimes and lying to the court 'on multiple occasions under oath'" and was involved in a "$800 million gas turbine scandal… that included allegations of bid rigging [and] corruption." Despite being "nothing more than a small, local switchgear rental business at the end of 2023" MER was "seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris" immediately after Tuma joined the Company.  The report then described how, in that period, MER had acquired substantially all of its turbines, primarily financed through the $71 million in debt that Solaris would later pay in the Acquisition. Contrary to Solaris's claims "that MER had a 'contracted and diversified earnings stream[,]'" in fact, "that 96% of its Power Solutions revenue was derived from a single customer[.]"

4.      On this news, Solaris' stock price fell $4.15, or 16.9%, to close at $20.46 per share on March 17, 2025, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misrepresented and/or failed to disclose: (1) MER had little to no corporate history in the mobile turbine leasing space; (2) MER did not have a diversified earnings stream; (3) MER's co-owner was a convicted felon associated with multiple allegations of turbine-related fraud; (4) as a result, Solaris overstated the commercial prospects posed by the Acquisition; (5) Solaris inflated profitability metrics by failing to properly depreciate

its turbines; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.    Plaintiff Stephen Pirello, as set forth in the accompanying certification, incorporated by reference herein, purchased Solaris securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Defendant Solaris is incorporated under the laws of Delaware with its principal executive offices located in Houston, Texas. Solaris' common shares trade on the New York Stock Exchange ("NYSE") under the symbol "SEI."

13.    Defendant William A. Zartler ("Zartler") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.    Defendant Kyle S. Ramachandran  ("Ramachandran") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.    Defendants Zartler and Ramachandran (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Solaris provides equipment used in the completion of oil and natural gas wells in the United States.

### Materially False and Misleading

### Statements Issued During the Class Period

17.     The Class Period begins on July 9, 2024.[1]  On that day, Solaris issued a press release announcing its entry into a contribution agreement related to the acquisition of MER and providing certain financial updates for the second quarter of 2024. The press release reported the purported "Highlights and Strategy" of the MER acquisition, which touted MER's "*diverse set of end-markets and customers*," "*Compelling valuation*," and "*Experienced and aligned management team,*" with a "*long and successful track-record of managing power solutions.*" Specifically, the press release stated as follows, in relevant part:

**Transaction Highlights and Strategy**

• **Scale, end-market diversity, and contractual profile:** Entry into critical distributed power infrastructure solutions provides access to multiple, high-growth end-markets; pro forma business mix expected to be >50% distributed power infrastructure, supported by a robust contract profile and a diverse set of end-markets and customers

• **Compelling valuation:** Initial purchase multiple of 4.0x run-rate contracted Adjusted EBITDA*; MER's third quarter 2024 Adjusted EBITDA is forecasted to be approximately $12 million - $13 million, representing annualized run-rate Adjusted EBITDA of approximately $50 million; majority of MER's asset base currently under contract with a leading provider of artificial intelligence computing solutions

• **Attractive capital redeployment opportunity:** MER's existing power generation asset base of 153 MW is currently fully-utilized; the fleet is expected to grow to 478 MW by the end of the third quarter of 2025** through the purchase of

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

additional mobile turbines for approximately $308 million and is expected to be deployed at similar return profiles across a diverse customer base

• **Experienced and aligned management team:** MER's founders and management team will be fully-integrated into Solaris post-closing, leveraging their long and successful track-record of managing power solutions across a range of end-markets; following the closing of the transaction, MER's founders and management will own, in aggregate, approximately 27% of Solaris' outstanding shares

• **Synergies with our business:** Operational synergies are available to the combined platform via Solaris' engineering, manufacturing, field service, commercial and corporate infrastructure

• **Committed to growing shareholder value:** Conservative pro forma financial profile, with <2.0x leverage* at closing on a run-rate basis with further deleveraging as new power generation equipment is placed into service; committed to maintaining the current $0.48/share annualized dividend, which has been paid for 23 consecutive quarters

• **Aligned ownership:** After the closing of the transaction, management, insiders and MER's founders and management team will collectively own >50% of Solaris' total outstanding shares, creating further alignment between Solaris and its shareholders

Founded in 2022 and based in Houston, Texas, MER provides configurable sets of primarily natural-gas powered mobile turbines and ancillary equipment to energy, data center and other C&I end-markets. MER's solutions provide reliable and cost-effective power where grid infrastructure may not be available or is unreliable.

\*          \*          \*

**Q2 2024 Financial Update**

As of the date of this news release, Solaris has not finalized its financial results for the second quarter of 2024. However, based on preliminary information, Solaris expects second quarter revenue to be between $70 million and $75 million and Adjusted EBITDA to be between $20 million and $21 million for the second quarter of 2024. During the second quarter, Solaris repaid $14 million of debt, ending the quarter with $11 million of net debt.

18.     On July 9, 2024, the Company published an Investor Presentation in connection with announcing the contribution agreement related to the Acquisition. The Investor Presentation further touted MER as a "***premier provider of distributed power solutions***" with attractive

financial results making it a "***compelling value creation opportunity***." Specifically, the investor presentation stated as follows, in relevant part:



\*                                        \*                                        \*



19.     On November 4, 2024, Solaris issued a press release announcing its operating and financial results for the quarter ended September 30, 2024. The press release touted the Company's financial results as well as the recently completed MER acquisition. Specifically, the press release stated the following, in relevant part:

**Third Quarter 2024 Summary Results and Recent Highlights**

- Revenue of $75 million

- Net loss of $2 million and ($0.04) per diluted Class A share; Adjusted pro forma net income(1) of $4 million and $0.08 per fully diluted share

- Adjusted EBITDA(1) of $22 million

- On September 11, 2024, closed the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition"), a premier provider of distributed power solutions; established new Solaris Power Solutions segment

- Closed $325 million senior secured term loan to effectuate the MER Acquisition and to support continued growth capital investment into the Solaris Power Solutions fleet

- Executed additional power service agreements with customers, totaling approximately 450 megawatts ("MW") of generation capacity, or greater than 80% of expected 2025 ending capacity (including all deliveries on order); contract tenor ranges from two to four years, providing the Company significant earnings visibility

- Returned a total of $5 million to shareholders in third quarter 2024 through dividends, resulting in $183 million cumulatively returned to shareholders since 2018

- Approved fourth quarter 2024 dividend of $0.12 per share on October 30, 2024, to be paid on December 16, 2024, to holders of record as of December 6, 2024 which, once paid, will represent Solaris' 25th consecutive dividend

"During the quarter, Solaris both announced and closed on a transformative acquisition, while continuing to deliver strong service quality for our customers across both business segments," Chairman and Chief Executive Officer Bill Zartler commented.

"The commercial opportunity set for our Power Solutions segment is accelerating rapidly, further highlighting the demand for 'behind-the-meter' power generation applications across a variety of end markets. We are pleased to announce that since closing the acquisition we have signed several power service contracts at tenors ranging from two to four years, bringing our customer agreements to over 80% of our expected ending 2025 capacity. This is a testament to both the strong team we have in place, as well as the broad-based growth in electrification and artificial intelligence computing applications.

"Our Solaris Logistics Solutions segment continues to focus on technology advancements that drive efficiency gains and add value for our customers, which is evident in our leading market position within the Logistics Solutions segment and the continued adoption of our new technologies. We remain committed to the provision of exceptional service quality by leveraging our company culture and innovative technologies across both of our business segments. Together, the combined business provides a balanced and attractive financial profile that is also uniquely positioned to grow and drive total shareholder value."

20.    On November 7, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report alleged the Company held $306.395 million in property, plant and equipment, net, and $939.487 million in total assets. The quarter report also described the purported terms of the Acquisition, as well as the Company's purported evaluation of the allocation of the total purchase consideration to the identifiable assets acquired and liabilities assumed in the Acquisition. Finally, the quarterly report asserted the Company's assumed useful life for its turbine equipment held for lease was "25 years." Specifically, the quarterly report stated the following, in relevant part:

9

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 18,634 | $ 5,833 |
| Restricted cash | 97,907 | — |
| Accounts receivable, net of allowances for credit losses of $681 and $104, respectively | 50,321 | 44,916 |
| Accounts receivable - related party | 6,444 | 2,378 |
| Other receivables | 6,502 | — |
| Prepaid expenses and other current assets | 6,059 | 4,342 |
| Inventories | 11,165 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 197,032 | 67,141 |
| Property, plant and equipment, net | 306,395 | 325,121 |
| Equipment held for lease, net | 212,664 | — |
| Non-current inventories | 1,635 | 1,593 |
| Non-current receivables, net of allowances of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 10,087 | 10,721 |
| Goodwill | 101,007 | 13,004 |
| Intangible assets, net | 73,698 | 702 |
| Deferred tax assets | 34,504 | 48,010 |
| Other assets | 1,396 | 342 |
| Total assets | $ 939,487 | $ 468,297 |

\*                                      \*                                      \*

Solaris Power Solutions, recently established following the acquisition of Mobile Energy Rentals LLC ("MER"), provides mobile power generation solutions through equipment lease arrangements. On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of MER. ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*                                      \*                                      \*

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). ***The integration of our legacy business with MER's operations is expected to enhance our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.***

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million,*** consisting of the following amounts:

| | Amount |
|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | 77.1 |
| Initial Cash Consideration (net of initial working capital adjustments) | 44.9 |
| Cash Paid for MER's Closing Cash Balance | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ 323.1 |

\*                    \*                    \*

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets*** acquired and liabilities assumed, based on their fair values at the acquisition closing date.

| | Amount |
|---|---|
| Cash | $ 14.7 |
| Accounts receivable | 7.5 |
| Inventories | 2.5 |
| Prepaid expenses and other current assets | 0.1 |
| Property and equipment and equipment held for lease | 158.7 |
| Operating lease right-of-use assets | 0.4 |
| Intangible assets - customer relationships (1) | 65.9 |
| Intangible assets - trademarks (2) | 8.0 |
| Total assets acquired | $ 257.8 |
| | |
| Accounts payable | $ 5.0 |
| Accrued liabilities | 0.7 |
| Deferred revenue | 11.9 |
| Operating lease liabilities | 0.4 |
| Finance lease liabilities | 0.2 |
| Deferred tax liabilities | 4.5 |
| Total liabilities assumed | $ 22.7 |
| | |
| Net assets acquired | 235.1 |
| | |
| Goodwill | $ 88.0 |

   (1)  Customer relationships are being amortized over a 10-year life.
   (2)  Trademarks are being amortized over a 5-year life.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches.*** The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market approach was also considered, analyzing recent transactions of comparable property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademark***s. Several significant assumptions were involved in the application of these valuation methods, including forecasted sales volumes and prices, royalty rates, contributory asset charges, discount rates and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful lives.

***The value assigned to goodwill in connection with the business combination is $88.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition.*** The

amount of goodwill deductible for tax purposes is $18.5 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

\*                    \*                    \*

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Segment assets: | | |
| Solaris Logistics Solutions | $ 381.6 | $ 401.1 |
| Solaris Power Solutions | 392.3 | — |
| Total segment assets | $ 773.9 | $ 401.1 |
| Corporate assets | 165.6 | 67.2 |
| Consolidated assets | $ 939.5 | $ 468.3 |

\*                    \*                    \*

**(f) Property, plant and equipment and equipment held for lease**

Property, plant and equipment and equipment held for sale are stated at cost or fair value for assets acquired in a business combination, less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production method.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | Up to 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

Expenses for maintenance and repairs are charged to operations as incurred, while betterments that increase the value or significantly extend the life of the related assets are capitalized.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

21.     On February 20, 2025, Solaris issued a press release announcing its operating and financial results for the quarter and fiscal year ended December 31, 2024. The press release touted the Company's financial results as well as the growth of the Company's new power solutions segment. Specifically, the press release stated the following, in relevant part:

**Fourth Quarter 2024 Summary Results and Key Business Updates**

- **Revenue** – Revenue of $96 million increased 28% sequentially from the third quarter 2024 due to a full quarter of contribution from Solaris Power Solutions following the closing of the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition") on September 11, 2024, as well as continued activity growth within Solaris Power Solutions.

- **Profitability**

  o     Net income of $14 million and $0.19 per diluted Class A share; Adjusted pro forma net income(1) of $7 million and $0.12 per fully diluted share

  o     Total Adjusted EBITDA(1) of $37 million

- **Cash Flow and Capital Expenditures** – Net cash from operating activities was $13 million in the fourth quarter 2024, and capital expenditures were approximately $127 million, which primarily consisted of progress and delivery payments for power equipment. Net cash used in investing activities was approximately $115 million.

- **Balance Sheet and Liquidity** – As of December 31, 2024, Solaris had $325 million in outstanding borrowings and $160 million in total cash, of which $46 million was restricted for certain growth capital expenditures. The year-end cash balance reflected the impact from the net proceeds of approximately $156 million from an underwritten public offering of 6.5 million shares of Class A common stock on December 11, 2024.

- **Power Solutions Growth Update** – Recently secured an additional 700 megawatts ("MW") of gas-powered turbines with majority of deliveries expected to occur throughout 2026, bringing Solaris' pro forma operated power fleet to approximately 1,400 MW by the first half of 2027. Total expected capital expenditures, including allowance for balance-of-plant and emissions control technology, associated with these orders(4) are estimated to be approximately $600 million.

22.     On March 5, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results.  The annual report alleged the Company held $298.828 million in property, plant and equipment, net, and $1.123 billion in total assets. The annual report also described the purported terms of the Acquisition, as well as the Company's alleged evaluation of the allocation of the total purchase consideration to the identifiable assets acquired and liabilities assumed in the Acquisition. Finally, the annual report asserted the Company's assumed useful life for its turbine equipment held for lease was "25 years." Specifically, the annual report stated the following, in relevant part:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 114,255 | $ 5,833 |
| Restricted cash | 45,612 | — |
| Accounts receivable, net of allowances of $681 and $104, respectively | 71,774 | 44,916 |
| Accounts receivable - related party | — | 2,378 |
| Prepaid expenses and other current assets | 8,387 | 4,342 |
| Inventories | 10,948 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 250,976 | 67,141 |
| Property, plant and equipment, net | 298,828 | 325,121 |
| Equipment held for lease, net | 339,932 | — |
| Non-current inventories | 1,693 | 1,593 |
| Non-current receivables, net of allowance of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 9,966 | 10,721 |
| Goodwill | 103,985 | 13,004 |
| Intangible assets, net | 71,521 | 702 |
| Deferred tax assets, net | 43,574 | 48,010 |
| Other assets | 1,337 | 342 |
| Total assets | $ 1,122,881 | $ 468,297 |

\*                    \*                    \*

On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of Mobile Energy Rentals LLC ("MER"). ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris with an entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*                    \*                    \*

14

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). Since the completion of the MER Acquisition, we have made significant progress in integrating our legacy business with MER's operations, enhancing our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million,*** consisting of the following amounts:

| | | Amount |
|---|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ | 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | | 77.1 |
| Cash Consideration (net of working capital adjustments) | | 44.9 |
| Cash Paid for MER's Closing Cash Balance | | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ | 323.1 |

\*                    \*                    \*

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets acquired and liabilities assumed, based on their fair values at the acquisition date.***

| | | Amount |
|---|---|---|
| Cash | $ | 14.7 |
| Accounts receivable | | 7.5 |
| Inventories | | 2.5 |
| Prepaid expenses and other current assets | | 0.1 |
| Property and equipment and equipment held for lease | | 158.7 |
| Operating lease right-of-use assets | | 0.4 |
| Intangible assets - customer relationships (1) | | 65.9 |
| Intangible assets - trademarks (2) | | 8.0 |
|     Total assets acquired | $ | 257.8 |
| | | |
| Accounts payable | $ | 5.0 |
| Accrued liabilities | | 0.7 |
| Deferred revenue | | 11.9 |
| Operating lease liabilities | | 0.4 |
| Finance lease liabilities | | 0.2 |
| Deferred tax liabilities (3) | | 7.5 |
|     Total liabilities assumed | $ | 25.7 |
| | | |
| Net assets acquired | | 232.1 |
| | | |
| Goodwill | $ | 91.0 |

    (1)  Customer relationships are being amortized over a weighted average period of 9.3 years.
    (2)  Trademarks are being amortized over a weighted average period of 5 years.
    (3)  In the fourth quarter of 2024, a measurement period adjustment was made to increase deferred tax liabilities by $3.0 million related to the acquired long-lived tangible assets, with a corresponding increase to goodwill.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches.*** The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market

approach was also considered, analyzing recent transactions of comparable property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademarks.*** Several significant assumptions were involved in the application of these valuation methods, including revenue growth rate, royalty rates, contributory asset charges, probability of renewal curves, discount rates and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful lives.

***The value assigned to goodwill in connection with the business combination is $91.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition.*** The amount of goodwill deductible for tax purposes is $13.1 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

*          *          *

| | December 31, | | |
|---|---|---|---|
| | 2024 | | 2023 |
| Segment assets: | | | |
| Solaris Logistics Solutions | $ 371.7 | $ | 401.1 |
| Solaris Power Solutions | 535.3 | | — |
| Total segment assets (1) | $ 907.0 | $ | 401.1 |
| Corporate assets (2) | 215.9 | | 67.2 |
| Consolidated assets | $ 1,122.9 | $ | 468.3 |

(1) Segment assets consist of accounts receivable, prepaid assets, inventories, goodwill and long-lived assets.
(2) Corporate assets consist of cash and cash equivalents, restricted cash, prepaid expenses, deferred tax assets and other assets.

*          *          *

## Property, Plant and Equipment and Equipment Held for Lease

Property, plant and equipment, as well as equipment held for lease, are initially recorded at cost, except for assets acquired in a business combination, which are recorded at fair value on the acquisition date. At period-end, these assets are reported at their initial measurement (whether at cost or fair value) less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production method. We also capitalize interest on borrowings directly attributable to the

acquisition or construction of certain capital assets. The capitalized interest is included in the cost of the asset and is subsequently depreciated over its estimated useful life.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | 5 - 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

Expenses for maintenance and repairs are charged to operations as incurred, while betterments that increase the value or significantly extend the life of the related assets are capitalized. When assets are sold or disposed of, the related cost and accumulated depreciation are removed from the consolidated balance sheets, and any resulting gain or loss is recognized in the consolidated statement of operations.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

23.    The above statements identified in ¶¶ 17-22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misrepresented and/or failed to disclose: (1) MER had little to no corporate history in the mobile turbine leasing space; (2) MER did not have a diversified earnings stream; (3) MER's co-owner was a convicted felon associated with multiple allegations of turbine-related fraud; (4) as a result, Solaris overstated the commercial prospects posed by the Acquisition; (5) Solaris inflated profitability metrics by failing to properly depreciate its turbines; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

24.    On March 17, 2025, at approximately noon EST, Morpheus Research published a short report entitled "Solaris Energy Infrastructure: How A Crumbling Texas Oilfield Services Company Gambled It All On A Convicted Felon And The World's Richest Man" (the "Report"). The Report alleged, among other things, that MER was, only months before the Acquisition, "a ~$2.5 million revenue equipment leasing business based out of a condo **with zero employees, no turbines, and no track record in the mobile turbine rental industry.**" The Report revealed that one of MER's co-owners, Tuma, was in fact, a "convicted felon" for "environmental crimes and lying to the court 'on multiple occasions under oath'" and was involved in a "$800 million gas turbine scandal... that included allegations of bid rigging [and] corruption."   Specifically, the Report stated the following, in relevant part:

> **Solaris CEO Bill Zartler Told Shareholders That He Has Known MER's Management Team "For A Long Time" And That He Believes "The Cultural And Operational Fit" Between The Two Businesses Is "Highly Complementary"**
>
> **MER's Management Team Includes John Tuma, Who Received A 5-Year Prison Sentence In 2012 After Being Convicted Of Environmental Crimes And Lying To The Court "On Multiple Occasions Under Oath"**
>
> **Today, Tuma Owns 12% Of Solaris' Shares And Is Employed At Solaris As A "Senior Technical Advisor"**
>
> \*    \*    \*
>
> While Solaris' CEO told shareholders that he has known MER's management for a "long time," he failed to disclose that Tuma has a track record of fraud and corruption. As one industry consultant told us, Tuma has a reputation of not being a "straight shooter":
>
>> No, he's not a straight shooter. His reputation is not as a straight shooter. . . . I haven't seen anything personally, let me put it that way. . . . but his reputation was enough that I didn't want to have long-term dealings with him. . . . I would be much happier if he wasn't part of [Solaris] if I was investing my own money.

In March 2012, Tuma was <u>convicted</u> by a federal jury for discharging an estimated <u>200,000 gallons</u> a day of hazardous wastewater directly into Louisiana's Red River. According to the U.S. Department of Justice, he was sentenced to 5 years in prison, followed by a 3-year probation and a $100,000 fine:

**Shreveport, La., Wastewater General Manager and Former Owner Sentenced to Five Years in Prison for Discharging Pollutants into the Red River**

(Source: <u>DOJ</u>)

Specifically, the <u>indictment</u> alleged that Tuma was directly responsible both for instructing employees to bypass environmental monitoring systems and attempting to <u>obstruct</u> the EPA investigation.

Moreover, the Court found (emphasis added) that Tuma "was untruthful at trial with respect to material matters in [the] case. Specifically, **Mr. Tuma lied on multiple occasions under oath** about intentionally discharging untreated wastewater to the City of Shreveport and the Red River." That transgression led the Court to increase the severity of Tuma sentence, according to the Court's opinion. [<u>Pgs. 81-82</u>]

Tuma was released from prison in April 2017, according to the <u>Federal Bureau of Prisons</u>.

**Solaris Told Its Shareholders That MER's Management Had A "Long And Successful Track-Record Of Managing Power Solutions"**

**After His Release From Prison, Tuma Founded Life Cycle Power, Which Was At The Center Of An $800-Million Gas Turbines Scandal In Houston That Included Allegations Of Bid Rigging, Corruption, And The Inability To Deliver The Promised Number Of Turbines**

**Ross Bartley, Now Solaris' EVP Of Power Solutions, Worked Alongside Tuma As Life Cycle Power's CFO**

25.     The Report described how "Tuma's felony convictions limited his ability to access financing," but he was "able to circumvent his lack of creditworthiness by joining MER, a small local equipment leasing business founded by Johnson just 2 years earlier." The Report revealed that despite being "nothing more than a small, local switchgear rental business at the end of 2023" MER was "seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris" immediately after Tuma joined the Company. The Report then described how, in that period, MER had acquired substantially all of the Company's turbines, primarily

financed through the $71 million in debt that Solaris would later pay in the Acquisition. The Report also revealed that, though "at the time of the MER acquisition, Solaris told shareholders that MER had a 'contracted and diversified earnings stream[,]'" in fact, "that 96% of its Power Solutions revenue was derived from a single customer[.]"

### Part II: How Tuma, A Convicted Felon, And His Partner Parlayed $54.7 Million Of Turbines Into $460 Million In Cash And Stock From Solaris

Tuma's felony convictions limited his ability to access financing, according to a former Sales Manager of a gas turbine OEM who interacted with him after his release from prison. He told us that:

> It was really hard for us at [redacted OEM name] to sell him anything because we couldn't get him financed because of his conviction.

Tuma was able to circumvent his lack of creditworthiness by joining MER, a small local equipment leasing business founded by Johnson just 2 years earlier.[7]

### At The Time Of The Acquisition, Solaris Described MER As A "Premier Provider Of Distributed Power" That Provided "Natural-Gas Powered Mobile Turbines" With A Unique And Successful Team

### Reality Check: As Of 2023, MER Was A ~$2.5 Million Revenue Equipment Leasing Business Based Out Of A Condo With Zero Employees And No Turbine Assets

\*        \*        \*

MER appears, however, to have been little more than a shell company that didn't own a single mobile turbine by the end of Q1 2024, according to its financial statements. MER reported just $2.46 million in revenue in 2023, primarily from leasing switchgear equipment rather than deploying mobile turbines. The company had total equity of just $5.3 million at the end of that year.[8]

Furthermore, Solaris' proxy statement revealed that MER had no employees at the time of its acquisition by the Company and, in fact, never had any.

After Solaris announced the acquisition in July 2024, MER listed its "contact" and "principal executive office" address as 2929 Buffalo Speedway, Suite A1024, Houston, Texas, per an archived version of its website from August 1, 2024, and a proxy statement filed by Solaris:



(Website Archive August 1, 2024, Source: *WaybackMachine*)

This 2929 Buffalo Speedway address is a high-rise residential building in Houston, Texas, with unit number "A1204" being a 3-bedroom condo. The property is <u>owned</u> by Johnson's son, Sean G. Johnson[.]

*    *    *

**MER Transformed In The First Half Of 2024 – Winning Its First Data Center Contract, Securing A 153MW Fleet Of Turbines, And Placing Orders For New Turbines**

**The Turbines And Deposits For New Turbines Were Covered Through $71 Million In Debt Financing And A $54.7 Million "Property & Equipment" Contribution From Tuma & His Affiliates, Per An Industry Expert**

**The $71-Million Debt Was Paid Down By Solaris**

Despite appearing as nothing more than a small, local switchgear rental business at the end of 2023, MER's business seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris.

By March 2024, MER had <u>entered</u> into a revenue contract with a data center worth $39 million that represented <u>16x</u> its previous year revenue, according to its financial statements.[9]

By June 30, 2024, MER had come into possession of $88.6 million worth of turbines, with another $42.3 million of new turbines on order, accounted for as "construction in progress," according to its financial statements:[10]

**MER's Property And Equipment, As of <u>March 31, 2024</u> Showing No Turbines**

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Switchgear equipment | $4,506,500 | $4,506,500 |
| Trailers | 87,000 | 87,000 |
| Other ancillary equipment | 127,500 | 127,500 |
| Total property and equipment | 4,721,000 | 4,721,000 |
| Less: accumulated depreciation | (930,296) | (813,996) |
| | $3,790,704 | $3,907,004 |

**MER's Property And Equipment, As of <u>June 30, 2024</u> Showing $88 Million Worth Of Turbines And $42 Million Worth Of Deposits**

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Turbines | $ 88,686,000 | $ — |
| Switchgear equipment | 4,506,500 | 4,506,500 |
| Trailers | 222,120 | 87,000 |
| Other ancillary equipment | 869,400 | 127,500 |
| Finance lease assets | 314,198 | — |
| Construction in progress | 42,312,000 | — |
| Total property and equipment | 136,910,218 | 4,721,000 |

(Source: MER financial statements as of <u>March 31, 2024</u> and <u>June 30, 2024</u>)

MER received some of these turbines via a $54.7 million "property and equipment" <u>contribution</u> from one of its owners. The remaining ~$71 million was <u>financed</u> through debt, according to MER financial statements as of June 30, 2024.[11]

| | | |
|---|---|---|
| Cash flows from financing activity: | | |
| Distributions to members | (1,000,000) | — |
| Net cash used in financing activity | (1,000,000) | — |
| Net change in cash | 1,988,975 | 970,912 |
| Cash, beginning of period | 943,275 | 583,014 |
| **Cash, End of Period** | **$ 2,932,250** | **$1,553,926** |
| Non-cash operating, financing and investing activities: | | |
| Right-of-use assets acquired from operating lease | $ 413,627 | $ — |
| Right-of-use assets acquired from finance lease | 314,198 | — |
| Property and equipment accrued in accounts payable | 33,669,855 | — |
| Additions to property and equipment through contributions from members | 54,700,000 | — |
| Additions to property and equipment paid by members through related party debt | 37,102,000 | — |

$70.7 million ←

(Source: ME's <u>Cash Flow Statement</u> for 1H 2024)

The $54.7 million contribution from one of MER's owner mirrors the value of Tuma's pay out from Goldfinch, suggesting that Tuma may have used his payout from LCP to acquire more turbines and contribute them to MER.

An industry expert familiar with the deal told us that Tuma had gotten a "settlement" from LCP and that he plunged "all the money into an order" for more turbines.

At acquisition, Solaris paid down all of MER's $71 million <u>debt</u> from its initial acquisition of turbines, according to a <u>current report</u> filed by Solaris on September 17, 2024. This indicates that Tuma and his partner's primary contribution to the business was $54.7 million worth of turbines, as well as <u>~$5 million</u> in assets from **the legacy MER business.**[12] **(<u>1</u>, <u>2</u>)**

**At Acquisition, Solaris Paid Tuma And His Affiliate $60 Million In Cash And ~16.5 Million Shares, Worth ~$186 Million At Closing And Approximately $400 Million Today**

**Ultimately, Solaris Doubled Its Leverage To Pay 3.19x Book Value For A Commoditized Business With One Data Center Customer**

Solaris' acquisition of MER resulted in a significant windfall for Tuma and Johnson, the only two members of MER at the time the acquisition was announced.

Solaris paid $60 million in cash and 16.46 million shares – worth $186.4 million at the time of closing and closer to approximately $400 million as of the date of this report. The price paid significantly outweighs the value of the assets acquired, especially considering that Solaris immediately depreciated MER's assets by ~$10.6 million upon acquisition.[13]

Solaris effectively doubled its leverage to acquire MER. Furthermore, the Company paid a rich book-value multiple of 3.19x for a business that offered little to no differentiation from its competitors. All this for a single data center relationship.[14]

26.    The Report also alleged Solaris "appears to have inflated short-term profitability through basic accounting games" including by "depreciating its gas turbines assuming they have a useful life of 25 years" while others operating the same type of turbines estimate a useful life of approximately 8.5 years.

**Solaris Depreciates Its Turbines Assuming They Have A Useful Life Of 25 Years — Inflating Short-Term Profitability**

**The Founder Of A Solaris Competitor Told Us His Company Was Modeling A Maximum Of 2.5 Overhauls For Turbines And Generators, Implying A Maximum Useful Life Of ~10 Years For Gas Turbines**

**Aggreko, A Direct Competitor Of Solaris, Depreciates Its Equipment Over A Maximum Of 12 Years**

An easy way for a capital-intensive business to inflate its current period profitability is to extend the useful life of assets beyond that of peers and industry norms in order to lower yearly depreciation rates — as it seems Solaris is doing by choosing a 25-year useful life for its turbines and straight line depreciation method, according to its most recent annual report.

Given that Solaris' turbines need extensive overhaul at least every 4 years, costing up to ~50% of the unit cost, the Company might have to spend more than the unit cost after 2 overhauls. In line with that assessment, the founder of a Solaris competitor with a fleet of gas turbines and generators told us that his Company was modeling for 2.5 overhauls as the maximum for its turbines or generators:

> What we put into our model is, is, you know, we split the baby and then call it 2.5 [overhauls] on average in the aggregate.

23

Factoring in 2.5 overhauls, Solaris' turbines should have a useful life of around 10 years. At the very least, we can see no justification for the claim of a 25-year lifespan.

Solaris' accounting treatment also appears vastly out of line with global peers. For instance, Aggreko, a business specializing in "rental solutions covering power generation," just as Solaris does, contrasts starkly in determining the useful life of its rental fleet.

By the end of 2020, Aggreko owned a fleet with a total capacity to generate 9,365 MW— including a 1,357 MW capacity from gas engines, according to its 2020 annual report.[20]

Aggreko disclosed an 8-12 year useful life range for its entire rental fleet:



**Property, plant and equipment**
Our rental fleet accounts for £793 million, which is around 80% of the net book value of the Group's property, plant and equipment. The majority of equipment in the rental fleet is depreciated on a straight-line basis to a residual value of zero over eight years, with some classes of rental fleet depreciated over 10 and 12 years. The annual fleet depreciation charge of £227 million (2019: £265 million) reflects the estimated service lives allocated to each class of fleet asset. Asset lives are reviewed at the start of each year and changed, if necessary, to reflect their remaining lives in light of technological change, prospective economic utilisation and the physical condition of the assets. As noted on page 25 the Group incurred a net impairment charge of £55 million on total property, plant & equipment. This is explained in Note 7 to the Accounts.

(Source: Agrekko Annual Report, 2020)

This figure is less than half the useful life claimed by Solaris for its mobile gas turbines.

The disparity in how Solaris accounts for the useful life of its power generation units relative to peers suggests that the Company is doing so to inflate its near-term profitability.

**We Estimate That If Solaris Used An Adequate Depreciation Methodology, The Depreciation Charge Associated With Its Turbines Would Increase By ~108%**

We estimate that if Solaris used an adequate depreciation methodology, like its peer Aggreko, Solaris' depreciation expense associated with its turbine fleet would be ~108% higher than its current charge.[21]

In short, we believe Solaris has resorted to accounting machinations to materially inflate its short-term profitability.

27.    On this news, Solaris' stock price fell $4.15, or 16.9%, to close at $20.46 per share on March 17, 2025, on unusually heavy trading volume.

## **CLASS ACTION ALLEGATIONS**

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Solaris securities between July 9, 2024 and March 17, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Solaris' shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Solaris shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Solaris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Solaris; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

33.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34.      The market for Solaris' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Solaris' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Solaris' securities relying upon the integrity of the market price of the Company's securities and market information relating to Solaris, and have been damaged thereby.

35.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Solaris' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Solaris' business, operations, and prospects as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Solaris' financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38.     During the Class Period, Plaintiff and the Class purchased Solaris' securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Solaris, their control over, and/or receipt and/or modification of Solaris' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Solaris, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for Solaris' securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Solaris' securities traded at artificially inflated prices during the Class Period.   On February 21, 2025 the Company's share price closed at a Class Period high of $35.96 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Solaris' securities and market information relating to Solaris, and have been damaged thereby.

41.     During the Class Period, the artificial inflation of Solaris' shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Solaris' business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Solaris and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all

relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.    At all relevant times, the market for Solaris' securities was an efficient market for the following reasons, among others:

(a)    Solaris shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Solaris filed periodic public reports with the SEC and/or the NYSE;

(c)    Solaris regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Solaris was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for Solaris' securities promptly digested current information regarding Solaris from all publicly available sources and reflected such information in Solaris' share price. Under these circumstances, all purchasers of Solaris' securities during the Class Period suffered similar injury through their purchase of Solaris' securities at artificially inflated prices and a presumption of reliance applies.

44.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Solaris who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

### Against All Defendants

46.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

47.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Solaris' securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

48.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Solaris' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Solaris' financial well-being and prospects, as specified herein.

50. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Solaris' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Solaris and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

51. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

52. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Solaris' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Solaris' securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Solaris' securities during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Solaris was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Solaris securities, or,

if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

57.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.    Individual Defendants acted as controlling persons of Solaris within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, Solaris and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  March 28, 2025

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By:    */s/ Sammy Ford IV*
        Sammy Ford IV
        State Bar No. 24061331
        Davis Metzger
        State Bar No. 24143206
        1221 McKinney Street, Suite 2500
        Houston, Texas 77010
        Telephone: (713) 665-1101
        Facsimile: (713) 665-0062
        Email:  sford@azalaw.com
                dmetzger@azalaw.com

**GLANCY PRONGAY & MURRAY LLP**
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff Stephen Pirello*